Walter JOHNSON, Plaintiff,

v.

The ECONOMIC DEVELOPMENT CORPORATION OF the COUNTY OF OAKLAND, Defendant.

No. Civ.A. 98–CV–71672–DT.

United States District Court, E.D. Michigan, Southern Division.

June 29, 1999.

**658**

Robert A. Sedler, Michael J. Steinberg, Detroit, MI, for Plaintiff.

Philip T. Carter, Marla G. Zwas, Howard & Howard, Bloomfield Hills, MI, Kevin T. Baine, Williams & Connolly, Washington. DC, for Defendant.

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, District Judge.

This matter is presently before the court on cross motions for summary judgment. The issues have been fully briefed and the court has heard oral argument. For the reasons stated below, the court shall grant defendant's motion and deny plaintiff's motion.

This is a First Amendment case that challenges the constitutionality of the procedure by which a construction project was financed at a school affiliated with the Catholic Church. The issue is whether the financing violated the Establishment Clause.

The parties have stipulated to all of the relevant facts, and they agree that the matter may appropriately be decided on summary judgment. The Academy of the Sacred Heart "is an independent Roman Catholic school (pre-school through grade 12) located in Bloomfield Hills, Michigan." Joint Stipulation of Facts, ¶ 62. "The Academy is a nonprofit organization ... and is exempt from federal income taxation...." *Id.* ¶ 63. "The Academy ... does not give a preference in admissions to Roman Catholics." *Id.* ¶ 68. "There is no religious-affiliation requirement or preference for the Academy's teachers, and the school does not inquire as to the religious affiliation of prospective faculty members." *Id.* ¶ 72. "The Academy offers a well-designed college-preparatory curriculum. Every student receives intensive training in the basic academic skills of English, mathematics, history, foreign languages and science. Art, music, drama, forensics, theology, computer science, and public service are essential parts of the program." *Id.* ¶ 74.

In its Recruiting Brochure, the academy describes itself as "a Christ-centered school operating in the evolving tradition of the [Catholic] Church...." Stipulation of Facts, Exhibit 20. Applicants for admission must support its "Goals and Criteria," the first of which is "to educate to ... a personal and active faith in God." *Id.* The school's religion department indicates that the academy "commits itself to a personal and active faith in God. Rooted in the love of Jesus Christ, the academy promotes personal and community prayer with reflection.... The academy teaches a respect for the various religious traditions of the world while presenting itself to the wider community as a Christ-centered institution within the tradition of the Roman Catholic Church." Stipulation of Facts, Exhibit 22 (Department Overviews and Course Description Sheets).

The dispute at issue in this case can trace its beginnings to March 1995, when the academy sought a means of financing a construction project. This project "consisted of (1) the construction of an approximately 6,700 square foot addition to the Academy's lower school, (2) renovation of and improvements to a science wing, and (3) other renovation of existing facilities (including new telephone equipment, classroom monitors, fiber-optic cable, intercom

system). The Project did not include any construction, renovation or improvement of the Academy's chapel." Joint Stipulation of Facts, ¶ 24.

The academy approached defendant, the Economic Development Corporation (EDC) of Oakland County. The Oakland EDC was created in 1980 pursuant to Michigan's EDC Act, M.C.L. §§ 125.1601–1636. *Id.* ¶ 10. That statute was enacted " 'to alleviate and prevent conditions of unemployment' and 'to assist and retain local industrial and commercial enterprises ... [and] to strengthen and revitalize the economy of the state and its municipalities.' " *Id.* ¶ 4, quoting M.C.L. § 125.1602. The statute authorizes EDCs, among other things, to "issue revenue bonds to finance building and improvement projects." *Id.* ¶ 8. Under the statute, "the municipality shall not be liable on notes or bonds of the EDC, and ... the notes and bonds shall not be a debt of the municipality." *Id.* ¶ 9.

The Oakland EDC is financed " 'from donations, gifts, grants, and devises, either solicited or unsolicited, obtained from public authorities, individuals, corporations and other organizations, by earnings from its activities, borrowings and issuance of revenue bonds and notes.' " *Id.* ¶ 15, quoting Article IX of the Oakland EDC's Articles of Incorporation. The Oakland EDC shares office space and telephone systems with the Oakland County Planning and Development Division, and reimburses the county for its share of building rent and other expenses. *Id.* ¶ 18.

In March 1995, the Oakland EDC "decided to issue economic development limited obligation revenue bonds" to finance the academy's construction project. *Id.* ¶ 27. Under its Resolution of Inducement, the Oakland EDC "specified that under no circumstances would the Oakland EDC, the County of Oakland, the State of Michigan or any of its taxpayers or citizens ever be required to pay principal of, interest on, or any other costs relating to the bonds." *Id.* In approving the academy's application, the Oakland EDC found

that there existed a need to "encourage the ... expansion of [commercial] enterprises in order to strengthen and revitalize the County's economy and to provide needed services and facilities to the County[ ] and its residents." The Resolution also stated that the Academy Project was a 'project' within the meaning of the EDC Act capable of providing needed services and facilities to the residents of the County, and that the construction of the project would "create job opportunities for the residents of the County and will aid in the general economic welfare of the County and the State of Michigan." The Resolution further stated that issuance of the bonds would assist the Academy to "establish, modernize, improve, reconstruct and/or expand its business within the County of Oakland." Based on projections provided by Academy representatives and the EDC staff's review of those projections, the EDC estimated that the Academy project would create 7 new permanent jobs, five teachers and two maintenance, at the Academy.

*Id.* ¶ 28.

In May 1995 the Oakland County Board of Commissioners approved the academy's project plan, and in June 1995 "the Oakland EDC unanimously adopted a Bond Authorizing Resolution authorizing the issuance of limited obligation revenue bonds for the Project." *Id.* ¶¶ 34, 35. Further, "[i]n approving the financing of the Project, the Oakland EDC acted without regard to the religious affiliation of the Academy." *Id.* ¶ 37. In June 1995, the Oakland EDC "issued variable rate demand limited obligation revenue bonds" to finance the academy's project. *Id.* ¶ 38. The bonds "were delivered to NBD Bank, which acted as placement agent in marketing the bonds, and sold to private investors." *Id.* ¶ 40. "The proceeds from the sale of the Bonds were loaned by the Oakland EDC to the Academy ... pursuant to a Loan Agreement.... Under the Loan Agreement, the Academy is respon-

sible for paying all costs and expenses includ[ing] any attorneys', trustee's, placement agent's or remarketing agent's fees, or any letter-of-credit, real estate, title-related or other costs incurred in connection with the Project." *Id.* ¶ 41. The loan was in the amount of $3.5 million and is being repaid over a ten-year period. *Id.* ¶ 46. The academy makes its loan payments directly to NBD Bank. *Id.* ¶ 42.

Interest on the bonds is exempt from Michigan and federal income taxation. *Id.* ¶¶ 44, 45. The Oakland EDC does not "monitor the Academy's payments of principal and interest to the bank." *Id.* ¶ 47. "The interest payments made by the Academy to the bank were less than such payments would have been for an otherwise comparable non-tax-exempt commercial loan." *Id.* ¶ 49. The parties also stipulate that the Oakland EDC spent approximately $1,795.76 in supervisor's and clerk's services in connection with processing the academy's application; and that the academy paid to the EDC $5,875 in fees. *Id.* ¶¶ 54, 55.

Finally, the parties also stipulate that since 1980 the Oakland EDC has financed "numerous projects using the same procedures and criteria that were used to approve the Academy Project.... Applicants have included numerous private businesses seeking tax-exempt financing for, inter alia, construction of factories and office buildings and purchase of machinery and equipment. Project applicants have also included a number of not-for-profit entities seeking to construct or make improvements to schools, medical facilities and nursing homes." *Id.* ¶¶ 57, 58. A complete list of all completed projects is attached to the parties' stipulation of facts as Exhibit 19. This list shows that from 1980 through 1998, a total of 56 projects were financed by the sale of bonds authorized by the Oakland EDC. The bond amounts ranged from $500,000 to $42,900,000. The types of projects financed included renovation of, improvements to, and new construction of shopping centers, office and light industrial buildings, manufacturing and medical facilities, restaurants, nursing

homes, schools, and a golf course. The estimated number of jobs created by each project (except bond refinancing) ranged from 5 to 460. The Oakland EDC has financed several projects at schools and other educational facilities, some of which are religiously affiliated. *See* Stipulation of Facts, ¶ 59.

Plaintiff is a resident and taxpayer of Oakland County. *Id.* ¶ 1. He alleges that the Oakland EDC has violated the Establishment Clause because "[t]he issuance of revenue bonds ... provid[es] a significant financial benefit to Sacred Heart Academy and to other religious and pervasively sectarian institutions...." Second Amended Complaint, ¶ 15. Plaintiff also alleges that the issuance of revenue bonds to such institutions violates the EDC Act and the Michigan Constitution. Plaintiff seeks various relief, including a declaration that the issuance of revenue bonds for the benefit of Sacred Heart Academy violates the Establishment Clause; an injunction prohibiting the issuance of such bonds "for the benefit of religious and pervasively sectarian institutions, including parochial schools"; an order "directing the defendant ... to recall and nullify the revenue bonds it has issued for the benefit of Sacred Heart Academy"; and an order "that defendant ... take appropriate legal action against any institution that acted in concert or participation with the defendant ... to obtain repayment to the public treasury of such financial benefits received through the unconstitutional issuance of public revenue bonds to a sectarian institution." *Id.* pp. 5–6.

In a counterclaim, defendant asserts that it supports any building project which is in the community's best interest and that the applicant's religious affiliation is not considered. Defendant also asserts that "the pendency of this lawsuit, and the threat of other lawsuits, may impair the Oakland EDC's ability to finance other projects that meet the religiously neutral criteria of the EDC Act"; and that "[a] declaratory judgment that the issuance of

the Bonds in this case does not violate the Establishment Clause will eliminate any uncertainty raised by the filing of this lawsuit and will enable the Oakland EDC to fulfill its statutory mandate of promoting economic development through qualified projects in Oakland County in the future...." Counterclaim, ¶¶ 17, 20. Defendant seeks a declaration to the effect that "its issuance of limited obligation revenue bonds in connection with the Academy of the Sacred Heart Project and its policy of issuing limited obligation revenue bonds on a religiously neutral basis in accordance with the criteria of the EDC Act do not violate the Establishment Clause." Counterclaim, p. 10.

*Plaintiff's Standing*

■ As an initial matter, the court is persuaded that plaintiff has standing to sue. Defendant argues that plaintiff lacks standing because he has not suffered any specific injury, either actual or threatened. Defendant contends that it did not incur any expenses in issuing the bonds, as the academy paid $5,875 in fees, which exceeded the administrative costs in processing the project application. However, plaintiff correctly argues that as a taxpayer he has standing due to the potential loss of tax revenue caused by the issuance of tax-exempt bonds. *See Hawley v. City of Cleveland*, 773 F.2d 736, 741–42 (6th Cir. 1985). The issuance of tax-exempt bonds has an impact on the state's general fund, as the bondholders do not pay income tax on the interest. Plaintiff estimates that the Michigan treasury will lose $68,400 in tax revenue due to the bonds issued in this case. Regardless of the amount of the financial impact, it would appear to suffice to give plaintiff standing under *Hawley*. Thus, for present purposes the court will assume that plaintiff has standing.

■ Defendant also argues that plaintiff is guilty of laches because he did not file suit until three years after the bonds were issued. Plaintiff counters by arguing that he did not learn of the issuance of the bonds until January 1998, and that he filed suit promptly thereafter in April 1998.

The court is not persuaded that plaintiff delayed unduly in bringing suit; nor has defendant shown that the alleged delay has caused it any substantial prejudice. *See Bylinski v. The City of Allen Park*, 169 F.3d 1001, 1003 (6th Cir.1999) (noting that defendant must show unreasonable delay and prejudice to succeed with a defense of laches). Under these circumstances, the court shall not dismiss the complaint on these grounds.

*Cross Motions for Summary Judgment*

The parties agree that the case can be resolved on summary judgment, as the only question is one of law: whether defendant has violated the First Amendment by issuing revenue bonds to finance the construction project at the Sacred Heart Academy.

The starting point is the First Amendment itself, which states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." In dozens of cases, the Supreme Court has attempted to define the point at which state support of religious institutions, be it direct or indirect, financial or otherwise, violates the Establishment Clause. A review of the leading cases is instructive in determining whether defendant's actions in this particular case have crossed that point.

In *Everson v. Board of Educ. of Ewing Township*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), a township resolution, adopted pursuant to a state statute, allowed the township to reimburse parents for money spent transporting their children to school on public buses. A taxpayer brought suit on the grounds that the resolution and statute violated the Establishment Clause insofar as they authorized reimbursement of bus fares for children attending parochial schools. In rejecting this argument, the Supreme Court stated:

New Jersey cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution

which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion.... [W]e must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its *general State law benefits* to all its citizens without regard to their religious belief.

Measured by these standards, we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils *as a part of a general program* under which it pays the fares of pupils attending public and other schools.... [The First Amendment] *requires the state to be a neutral in its relations with groups of religious believers and non-believers;* it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them.

*Id.* at 16–18, 67 S.Ct. 504 (emphasis added).

In *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), plaintiffs challenged a program in New York City whereby students were released during the school day to attend religious services for one hour per week. The Court concluded that the release time program did not violate the Establishment Clause because it "involves neither religious instruction in public school classrooms nor the expenditure of public funds." *Id.* at 308–309, 72 S.Ct. 679. The Court also stated:

We would have to press the concept of separation of church and State to these extremes to condemn the present law on constitutional grounds.... [W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. *The government must be neutral* when it comes to competition between sects.

*Id.* at 313–14, 72 S.Ct. 679 (emphasis added). In People of the State of Ill. ex rel. *McCollum v. Board of Educ.*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Supreme Court had earlier invalidated a program whereby religious instructors were permitted to teach religious courses in classrooms during regular school hours. This practice ran afoul of the Establishment Clause because "the state's taxsupported public school buildings [were] used for the dissemination of religious doctrines" and because the state assisted sectarian groups by "provid[ing] pupils for their religious classes through use of the state's compulsory public school machinery." *Id.* at 212, 68 S.Ct. 461.

In *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Court found Establishment Clause violations in school districts where the school day was opened each day with readings from the Bible over the school intercom. The following test was articulated:

The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.

*Id.* at 222, 83 S.Ct. 1560. The Court also noted: "In the relationship between man and religion, the State is firmly committed to a position of neutrality." *Id.* at 226, 83 S.Ct. 1560.

In *Board of Educ. v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the issue was whether the Establishment Clause was violated by a state statute that required local public school authorities to lend textbooks without charge to all stu-

dents, including those attending parochial schools. The trial court declared the statute unconstitutional. The New York Court of Appeals reversed, finding the statute " 'completely neutral with respect to religion, merely making available secular textbooks at the request of the individual student and asking no question about what school he attends.' " *Id.* at 241, 88 S.Ct. 1923. The Supreme Court noted that "the line between state neutrality to religion and state support of religion is not easy to locate. 'The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, is one of degree.' " *Id.* at 242, 88 S.Ct. 1923. The Court reaffirmed the test from *Schempp,* requiring that the challenged government action must have both "a secular legislative purpose and a primary effect that neither advances nor inhibits religion." The Court concluded that this test was satisfied in the case of textbooks loaned to all students:

> The express purpose of § 701 was stated by the New York Legislature to be furtherance of the educational opportunities available to the young. Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. The law merely makes available to all children the benefits of a *general program* to lend school books free of charge.

*Id.* at 243, 83 S.Ct. 1560 (emphasis added). The Court also found it significant that only "secular books" were involved in this program. *See id.* at 244–45, 248, 83 S.Ct. 1560.

In *Walz v. Tax Comm'n of the City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the Court upheld a decision of the New York Tax Commission to grant a property tax exemption to religious organizations for properties used for religious worship. Plaintiff argued that the exemption amounted to state support of religion in violation of the Establishment Clause. In rejecting this argument, the Court stated:

> [F]or the men who wrote the Religion Clauses of the First Amendment the "establishment" of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity . . . .
>
> [T]he basic purpose of these provisions . . . is to insure that no religion be sponsored or favored, none commanded, and none inhibited . . . .
>
> Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice.

*Id.* at 668–70, 90 S.Ct. 1409.

In upholding the tax exemption, the Court first found that the legislative purpose was "neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility." *Id.* at 672, 90 S.Ct. 1409. The tax exemption was granted to a broad class of non-profit entities, including hospitals, libraries, and scientific and professional groups, as well as religious organizations. Regarding "entanglement," the Court stated:

> The test is inescapably one of degree. Either course, taxation of churches or exemption, occasions some degree of involvement with religion. Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes.
>
> Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing them. In analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement.

*Id.* at 674–75, 90 S.Ct. 1409. Applying this standard, the Court found no danger of

excessive entanglement, as the granting of a tax exemption "creates only a minimal and remote involvement between church and state and far less than taxation of churches." *Id.* at 676, 90 S.Ct. 1409.

In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court invalidated two statutes which provided state aid to parochial schools. One of the statutes paid a supplement to teachers of non-religious subjects, in order to raise their salaries to the level paid to public school teachers. Under the other statute, the state reimbursed parochial schools for textbooks and teacher salaries, but only for non-religious subjects. The Court stated:

> Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

*Id.* at 612–13, 91 S.Ct. 2105. Regarding the third prong of the test, the Court indicated that "we must examine the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Id.* at 615, 91 S.Ct. 2105. The Court determined that the statutes had a secular purpose, and found it unnecessary to decide whether their primary effect was to advance or inhibit religion. However, the Court invalidated the statutes on the grounds that they caused excessive entanglement between government and religion because the religious schools were required to provide a considerable amount of bookkeeping information to show that the state aid did not support any religious instruction. "A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First amendment otherwise respected." *Id.* at 619, 91 S.Ct. 2105.

In *Hunt v. McNair,* 413 U.S. 734, 736, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the Court considered a state statute which created an Educational Facilities Authority "to assist institutions for higher education in the construction, financing and refinancing of projects ... primarily through the issuance of revenue bonds." The EFA issued bonds for a Baptist college, which needed the money to refinance debt and to build a dining hall. A taxpayer sued, claiming that the issuance of the bonds violated the Establishment Clause. Applying the *Lemon* test, the Court found that the statute had a secular purpose because "[t]he benefits of the Act are available to all institutions of higher education in South Carolina, whether or not having a religious affiliation." *Id.* at 741, 93 S.Ct. 2868. Regarding primary effect, the Court noted it had consistently rejected "the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation...." *Id.* at 742, 93 S.Ct. 2868. The Court acknowledged that the Baptist college benefitted from the lower interest payments on tax-exempt bonds, but noted that the college was not "pervasively sectarian," that there were no religious qualifications for faculty or students, and that the bond revenue would not be spent on "any buildings or facilities used for religious purposes." *Id.* at 743–44, 93 S.Ct. 2868. In finding little danger of "excessive entanglement," one of the factors noted by the Court was that there was no realistic likelihood that the state bonding entity would make use of its power to inspect the college, to ensure that the funds were not being used for religious purposes, since no such inspection would occur unless the college defaulted on the loan. *Id.* at 747–49, 93 S.Ct. 2868.

*Committee for Public Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955 (1973), involved a challenge to three amendments to New York's Edu-

cation and Tax Laws. The first provided grants to nonpublic, nonprofit schools for maintenance and repair of facilities. The second provided tuition reimbursements for parents of children attending nonpublic schools. The third allowed parents of children attending nonpublic schools to take a tax deduction for money spent on tuition. While all three amendments were found to have a secular purpose, they failed to pass muster under the second and third prongs of the *Lemon* test.

The Court determined that the maintenance and repair amendment had a primary effect of advancing religion because the funds under this program went almost entirely to Catholic schools and "[n]o attempt [was] made to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes." *Id.* at 774, 93 S.Ct. 2955. The tuition reimbursement amendment was invalidated on essentially the same grounds. Since such grants could not be given to the schools directly, they also could not be given indirectly, via the parents who were paying the tuition. *See id.* at 780–83, 93 S.Ct. 2955. The tax deduction amendment failed because the Court could find no practical difference between a direct reimbursement for tuition and a tax deduction for such expenses. The Court also noted that the benefits of this tax deduction "flow primarily to the parents of children attending sectarian, nonpublic schools." *Id.* at 794, 93 S.Ct. 2955. This factor distinguished *Walz*, which involved a property tax exemption that "covered all property devoted to religious, educational, or charitable purposes." *Id.*

In *Roemer v. Board of Pub. Works of Maryland,* 426 U.S. 736, 739, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), plaintiffs challenged a state statute that provided "annual noncategorical grants to private colleges, among them religiously affiliated institutions, subject only to the restrictions that the funds not be used for 'sectarian purposes.' " The grants were available to any accredited private college in Maryland, except those which award "only seminarian or theological degrees." *Id.* at

740, 96 S.Ct. 2337. In finding no Establishment Clause violation, the Court stated:

> [R]eligious institutions need not be quarantined from public benefits that are *neutrally available to all....* Everson and Allen put to rest any argument that the State may never act in such a way that has the incidental effect of facilitating religious activity. The Court has not been blind to the fact that in aiding a religious institution to perform a secular task, the State frees the institution's resources to be put to sectarian ends. If this were impermissible, however, a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair. The Court never has held that religious activities must be discriminated against in this way.
>
> Neutrality is what is required. The State must confine itself to secular objectives, and neither advance nor impede religious activity.

*Id.* at 747, 96 S.Ct. 2337 (emphasis added).

In *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the Court upheld a state statute that permitted taxpayers to deduct amounts paid for tuition, textbooks and transportation, incurred in sending their children to any elementary or secondary school. The Court found the statute to have a clearly secular purpose—namely, "ensuring that the State's citizenry is well educated" and "assuring the continued financial health of private schools, both sectarian and nonsectarian." *Id.* at 395, 103 S.Ct. 3062. The primary effect of the statute was not to advance religion because the tax deduction was only one of many available under the state tax code and, "importantly, the deduction is available for educational expenses incurred by all parents, including those whose children attend public schools and those whose children attend nonsectarian private schools or sectarian private schools." *Id.* at 397, 103 S.Ct. 3062. "As Widmar and our other decisions indicate, a

program ... that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause." *Id.* at 398–99, 103 S.Ct. 3062.

More recently, in *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. at 10, 113 S.Ct. 2462 (1993), the Court held that the Establishment Clause is not violated when the state provides a sign language interpreter for a deaf student attending a sectarian school. The Court noted: "[W]e have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit." *Id.* at 8, 113 S.Ct. 2462.

■ Against the backdrop of this long line of Supreme Court precedent, the court concludes that no Establishment Clause violation has occurred in this case. The issuance of revenue bonds by the Oakland EDC, to finance Sacred Heart's construction project, easily passes all three prongs of the *Lemon* test. The statute creating EDC, as well as the Oakland EDC's by-laws, have a clearly secular purpose; the primary effect of the bond-issuing activity is to neither advance nor inhibit religion; and the issuance of the bonds does not give rise to a risk of excessive entanglement between government and religion.

In applying the *Lemon* factors to this case, first it is clear that the EDC Act has a secular purpose. The purposes of the statute are set forth at length at M.C.L. § 125.1602. These include alleviating unemployment by encouraging and assisting industrial and commercial enterprises. The parties stipulate that the statute was enacted for these purposes, and that "[t]he Oakland EDC was created pursuant to the terms of the EDC Act for the purposes set forth in the Act." Joint Stipulation of Facts, ¶¶ 4, 10. The Supreme Court has repeatedly indicated that a legislature's stated purpose is to be taken at face value in the absence of a showing of bad faith.

*See Hunt,* 413 U.S. at 741, 93 S.Ct. 2868; *Nyquist,* 413 U.S. at 773, 93 S.Ct. 2955; *Lemon,* 403 U.S. at 613, 91 S.Ct. 2105. Plaintiff has not shown that the stated purposes of the EDC Act or of the Oakland EDC itself should be questioned.

Nor can it be said that the primary effect of the EDC Act or of the bond issuance at issue in this particular case is to promote or inhibit religion. First, it is important to note that *any* commercial or industrial enterprise may apply to the Oakland EDC for assistance; the religious affiliation, if any, of the applicant, is completely irrelevant and not considered. Indeed, the parties have stipulated that "the Oakland EDC acted without regard to the religious affiliation of the Academy." Joint Stipulation of Facts, ¶ 37. In the cases summarized above, the Supreme Court has repeatedly indicated that a general program which makes assistance available to a broad spectrum on a religiously neutral basis ordinarily is not subject to an Establishment Clause challenge. Reimbursement of bus fares, the loaning of textbooks, the granting of property tax exemptions, the provision of grants and bond revenue, and the allowance of tax deductions for school expenses, all have survived such a challenge because these forms of assistance were not directed specifically toward sectarian institutions. Rather, in each case the assistance was directed toward a broader group, and sectarian institutions benefitted only incidentally or on a neutral basis along with other beneficiaries of the state action.

This is precisely the kind of program at issue in this case. Neither the EDC Act nor the Oakland EDC articles of incorporation mention religion or religiously affiliated institutions. The Oakland EDC approved the academy's renovation project without any consideration of the academy's affiliation with the Catholic Church. As the parties have stipulated, the Oakland EDC has approved 56 applications from 1980 to 1998, for projects running the gamut from new construction of shopping centers and medical offices to renovations of

schools and retail space. As the Court stated in *Roemer,* "religious institutions need not be quarantined from public benefits that are neutrally available to all." 426 U.S. at 747, 96 S.Ct. 2337.

It is also significant that none of the funds at issue in this case supported sectarian aspects of the academy. The parties have stipulated that the funds were used to construct an addition to the academy's lower school, to renovate and improve the science wing, and to renovate other existing facilities, such as telephone equipment and the intercom system; "[t]he Project did not include any construction, renovation or improvement of the Academy's chapel." Joint Stipulation of Facts, ¶ 24. The funds were not used to pay for religious books, teacher's salaries, or student tuition. In *Hunt* the Supreme Court noted that the bond revenue in that case would not be spent on "any buildings or facilities used for religious purposes." 413 U.S. at 744, 93 S.Ct. 2868.

The Court also finds it significant that the funds at issue in this case did not take the form of a grant or loan of tax-raised money. Instead, one hundred percent of the funds came from private investors. Joint Stipulation of Facts, ¶ 40. The Oakland EDC served merely as a conduit— that is, defendant simply provided a means by which private investors could finance the project. Not a single penny of the funds came from any state, county, or municipal source, and no public entity has any obligation whatsoever in connection with the sale or purchase of these *limited obligation* bonds. *Id.* ¶ 35, 38, 43. The application fees paid by the academy more than reimbursed the Oakland EDC for the administrative expenses incurred in processing the application. *Id.* ¶¶ 55, 56. And the academy is responsible for repaying all of the principal and interest. *Id.* ¶ 42. These facts distinguish the instant matter from the "maintenance and repair"

amendment found objectionable in *Nyquist* and more closely resemble those in *Hunt,* which upheld similar funding for the construction of a dining hall at a sectarian institution. Plaintiff argues that the arrangement amounts to a direct subsidy of the academy because the State of Michigan and the federal government cannot collect income taxes on the interest paid on bonds authorized by an EDC. In both *Walz* and *Hunt,* however, the same argument was raised and rejected. In both cases, the Supreme Court indicated that such "indirect costs"—whether occasioned by granting a property tax exemption or by funding a project through the sale of tax-exempt bonds—does not suffice to show a primary effect of advancing religion when the loss of revenue occurs as a result of providing a general benefit to a broad class of recipients under a religiously neutral government program. The same reasoning applies here.

Plaintiff does not argue that either the EDC Act or the issuance of the revenue bonds in this case poses any risk of "excessive entanglement" between government and religion. Nor does the court believe that any such argument could be made. The religious affiliation of the academy played no role in defendant's review of the academy's application, *see* Joint Stipulation of Facts, ¶ 37; and plaintiff does not contend, or present any evidence to suggest, that any applicant's religious affiliation has ever been considered by Oakland EDC or by any other economic development corporation in Michigan. Defendant's only contact with the academy was to process its application. *See* Joint Stipulation of Facts, Exhibit 3. Defendant does not monitor the academy's payments under the loan agreement. *Id.* ¶ 47. Under these circumstances, there is no danger of "official and continuing surveillance leading to an impermissible degree of entanglement." *Walz,* 397 U.S. at 675, 90 S.Ct. 1409.[1]

---

[1]. To the contrary, it seems clear that government and religion would become much more entangled if EDCs were required to deny funding to any religiously affiliated institution. If this were the case, EDCs would have to examine each application in an effort to identify those with any religious affiliation. This would also enhance the risk of discriminating against sectarian institutions in violation of the Free Exercise Clause. The

For these reasons, the court concludes that defendant has not violated the Establishment Clause by approving the limited obligation revenue bonds in this case. The statute and the bond issuance have no religious purpose. They do not have a primary effect of promoting religion. And there is no danger of "excessive entanglement" between the state and religion. Accordingly, the court shall grant defendant's motion for summary judgment and deny plaintiff's motion for summary judgment insofar as the second amended complaint asserts a violation of the First Amendment to the United States Constitution. However, the court shall declare only that defendant did not violate the Establishment Clause on the specific facts of this particular case. The court expresses no opinion as to the constitutionality of any other projects which may have been funded, or which may be funded in the future, by defendant Oakland EDC or by any other EDC acting under the authority of the EDC Act.

Plaintiff also claims that the issuance of the bonds in this case violated the EDC Act because the statute only authorizes financing of projects for industrial or commercial enterprises, and not schools. In addition, plaintiff alleges that the issuance of these bonds violates Article 8, Section 2, of the Michigan Constitution, which prohibits the appropriation of public monies, or the use of public credit, to "aid or maintain any private, denominational or other nonpublic pre-elementary, elementary or secondary school."

The court must dismiss these claims for lack of subject matter jurisdiction. Under 28 U.S.C. § 1367(c), the court "may decline to exercise supplemental jurisdiction over a claim if ... (3) the district court has dismissed all claims over which it has original jurisdiction." In this case, the court has original subject matter jurisdiction only over plaintiff's First Amendment claim. The other two claims are pure state law issues. The Supreme Court and the Sixth Circuit have repeatedly indicated that a district court should dismiss the state claims once the federal claim is resolved. For example, in *Williams v. City of River Rouge*, 909 F.2d 151, 157 (6th Cir.1990), the court stated:

> Where an action in federal court includes both federal and pendent state claims and the court dismisses the federal claims before trial on a motion for summary judgment, the pendent state claims are ordinarily dismissed as well. Pendent jurisdiction is a doctrine of discretion. In this case, the federal constitutional claims, which formed the basis for federal jurisdiction over the case, were properly dismissed by summary judgment before trial. Consequently, the contract claims will be dismissed. Moreover, the contract claims require interpretations of the City Charter of River Rouge and of Michigan contract law, questions more properly addressed by the Michigan courts. Therefore, the dismissal will be without prejudice.

*See also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). For these reasons, the pendent claims should be dismissed. As a matter of comity and feder-

---

Supreme Court has repeatedly called for government to be *neutral* in its treatment of religion. This goal is best served by permitting EDCs to evaluate applications without regard to the religious affiliation, if any, of the applicant, and to allow the EDCs to focus instead on the purely secular aspects of the proposed project in each case.

alism, it is more appropriate for Michigan courts to interpret the Michigan statute and the Michigan constitutional provision at issue.

Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied as to plaintiff's First Amendment claim. The court hereby DECLARES that defendant's issuance of limited obligation revenue bonds in connection with the Academy of the Sacred Heart project at issue in this case did not violated the Establishment Clause of the First Amendment to the United States Constitution.

IT IS FURTHER ORDERED that plaintiff's remaining claims are dismissed, without prejudice, for lack of subject matter jurisdiction.