RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0051P (6th Cir.)
File Name: 01a0051p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WALTER JOHNSON,
       *Plaintiff-Appellant,*

    *v.*

ECONOMIC DEVELOPMENT
CORPORATION OF THE
COUNTY OF OAKLAND,
       *Defendant-Appellee.*

No. 99-1884

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-71672—Bernard A. Friedman, District Judge.

Argued: November 29, 2000

Decided and Filed: February 27, 2001

Before: NELSON, SILER, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Robert A. Sedler, WAYNE STATE
UNIVERSITY LAW SCHOOL, Detroit, Michigan, for
Appellant. Kevin T. Baine, WILLIAMS & CONNOLLY,
Washington, D.C., for Appellee. **ON BRIEF:** Robert A.
Sedler, WAYNE STATE UNIVERSITY LAW SCHOOL,

1

Detroit, Michigan, for Appellant.    Emmet T. Flood, WILLIAMS & CONNOLLY, Washington, D.C., for Appellee.    Betty Lee Dunkum, CHRISTIAN LEGAL SOCIETY, Annandale, Virginia, for Amicus Curiae.

   CLAY, J., delivered the opinion of the court, in which SILER, J., joined.  NELSON, J. (pp. 32-34), delivered a separate concurring opinion.

---

**OPINION**

---

   CLAY, Circuit Judge.  Plaintiff, Walter Johnson, appeals from the district court's order denying summary judgment to Plaintiff and granting summary judgment to Defendant, the Economic Development Corporation of the County of Oakland ("Oakland EDC"), on Plaintiff's claim alleging that Defendant violated the First Amendment Establishment Clause by issuing tax-exempt revenue bonds to finance the construction of buildings at the Academy of the Sacred Heart (the "Academy"), a Catholic elementary and secondary school.  For the reasons that follow, we **AFFIRM** the district court's order denying summary judgment to Plaintiff and granting summary judgment to Defendant.

**BACKGROUND**

   Plaintiff is a resident and taxpayer of Oakland County, Michigan.  Defendant is a public economic development corporation incorporated pursuant to the Economic Development Corporation Act, Mich. Comp. Laws § 125.1601 *et seq.* (the "EDC Act" or "Act").  The Academy, a non-party, is an independent Roman Catholic school in Bloomfield Hills, Michigan.  For purposes of the summary judgment motion, the parties stipulated to facts in this case.

   In 1974, the Michigan Legislature enacted the EDC Act to "alleviate and prevent conditions of unemployment."  Mich.

make it unconstitutional for the state to exempt the auditorium building and other divinity school facilities from real estate taxes.  Is it not probable that the Supreme Court would also hold it constitutional for a state-created agency to assist the school with conduit financing on the same non-discriminatory basis as that used in facilitating financing for the Academy of the Sacred Heart in the case at bar?

The question need not be answered, at this juncture, because the Academy of the Sacred Heart does not happen to be pervasively sectarian.  I hope, however, that no one reading today's opinion will infer from it that we would necessarily hold the financing unconstitutional if the Academy's sectarian character were "pervasive."  Such an inference, in my judgment, would be unwarranted.

Comp. Laws Ann. § 125.1602 (West 1997).  To deal with the problems of unemployment, the legislature found that it was "necessary to assist and retain local industrial and commercial enterprises" and "to provide means and methods for the encouragement and assistance of industrial and commercial enterprises . . . in locating, purchasing, constructing, reconstructing, modernizing, improving, maintaining, repairing, furnishing, equipping, and expanding in this state and in its municipalities."  *Id.*  To further these goals, the EDC Act authorizes the creation of an economic development corporation ("EDC") in each municipality; municipality is defined as a county, city, village or township.  *See* Mich. Comp. Laws Ann. § 125.1603(d).  To accomplish the goals of the EDC Act, an EDC is authorized, *inter alia*, to borrow money and issue revenue bonds to finance building and improvement projects.  *See* Mich. Comp. Laws Ann. § 125.1607(d).  The EDC Act provides that the municipality shall not be liable on notes of the EDC, and that the notes and bonds shall not be a debt of the municipality.  *See* Mich. Comp. Laws Ann. § 125.1623(2).

Defendant was created pursuant to the terms of the EDC Act for the purposes set forth in the Act.  Defendant performs the functions authorized under section 125.1607 of the EDC Act relating to the approval of projects and the issuance of tax-exempt bonds in connection therewith, as well as other economic development related work for the Oakland County area.  Defendant has 15 regular voting members, none of whom are officials of Oakland County.  All voting members, as well as two project-specific, non-voting members are drawn from the private sector.

Article IX of Defendant's Articles of Incorporation provides that the Oakland EDC will be financed from donations, gifts, grants, and devises, either solicited or unsolicited, obtained from public authorities, individuals, corporations and other organizations, by earnings from its activities, borrowings and issuance of revenue bonds and notes.  Defendant uses the facilities of the Oakland County

Development and Planning Division (the "DPD") for its day to day operations. Defendant, however, reimburses the DPD for its proportionate share of the building rent, equipment and other overhead costs. In addition, the administrative support services for Defendant are furnished by two DPD employees, who spend between five and ten percent of their time working for Defendant. Defendant also reimburses the DPD for the proportionate salaries of these employees. Defendant has no taxing power. However, Defendant receives some portion of its revenue from certain unrefundable fees from project applicants. From each applicant, Defendant receives (1) a $500 fee at the project application phase; (2) a $500 fee at the "Resolution of Inducement" phase; (3) a $500 fee when the final project plan is submitted; and (4) a closing fee equal to 1/8 of 1% of the face value of bonds issued.

Founded in 1851, the Academy is an independent Roman Catholic school located in Bloomfield Hills, Michigan. The Academy has more than 450 students including pre-school from nearly forty communities. It is divided into four schools: Pre, Lower, Middle and Upper. It educates girls in grades K-12 and boys in grades K-5. The Academy is a nonprofit organization, as described in § 501(c)(3) of the Internal Revenue Code, and is exempt from federal income taxation under § 501(a) of the Code. The Academy, which is incorporated under the laws of Michigan, holds legal title to all school property.

Article II of the Academy's Restated Articles of Incorporation provides that the purpose of the Academy is to "conduct an independent Catholic school from pre-school through and including the 12th grade, wherein the arts and sciences, and other forms of primary and secondary learning are taught, and diplomas and honors therein conferred: while maintaining a philosophy consonant with that of the network of the Sacred Heart schools of which it is a member." (J.A. at 66.) The Academy's curriculum and requirements provide that

conventional sense of that term. See *Hunt v. McNair*, 413 U.S. 734 (1973) (a case the facts of which, as Judge Clay has indicated, bear a striking resemblance to those of the case at bar), where the Supreme Court explained this in some detail:

> "We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available." *Id*. at 745 n.7.

The *Hunt* Court left open the question whether the "aid" provided through this sort of financing – aid consisting of below-market interest rates resulting from the fact that the financing agency's bonds and the interest paid on the bonds enjoyed tax exempt status – should be treated like property tax exemptions for religious institutions. The constitutionality of such property tax exemptions is well established, of course. See *Walz v. Tax Comm'n*, 397 U.S. 664 (1970).

Without subjecting the reader to a detailed survey of the Supreme Court's numerous post-*Hunt* Establishment Clause cases, I think I can safely say that it is at least as likely now as it was 30 years ago that the Supreme Court, if forced to decide the issue, would hold that the Establishment Clause does not bar non-discriminatory conduit financing for "pervasively sectarian" schools. Suppose, for purposes of analysis, that the project in question here had consisted of the construction, renovation, or improvement of an auditorium building at a divinity school. Although the school would be "pervasively sectarian," under my hypothesis, this would not

---

**CONCURRENCE**

---

DAVID A. NELSON, Circuit Judge, concurring. I concur in the judgment and in virtually all of the opinion Judge Clay has written for the court. My sole purpose in writing separately is to register a lack of enthusiasm for any suggestion that conduit financing of the sort provided by the Oakland County Economic Development Corporation would necessarily violate the Establishment Clause if extended to a "pervasively sectarian" educational institution.

There was a time, to be sure, when the Supreme Court accorded constitutional significance to the distinction between "sectarian" schools and schools characterized as "pervasively sectarian." See *Mitchell v. Helms*, 120 S.Ct. 2530, 2582-83 (Souter, J., dissenting). That time, according to Justice Thomas, "is thankfully long past." *Mitchell*, 120 S.Ct. at 2550 (plurality opinion by Thomas, J.).[1] "If a program offers permissible aid to the religious (including the pervasively sectarian), the a-religious, and the irreligious," as Justice Thomas observed in announcing the Supreme Court's judgment in *Mitchell*, "it is a mystery which view of religion the government has established, and thus a mystery what the constitutional violation would be." *Id*. at 2551.

And whether ordinary state aid to "pervasively sectarian" schools be constitutional or not, conduit financing of the sort at issue here does not constitute "state aid" in the

---

[1] Justice Thomas chose his adverb with care; "hostility to aid to pervasively sectarian schools has a shameful pedigree that we do not hesitate to disavow." *Mitchell*, 120 S.Ct. at 2551 (plurality opinion by Thomas, J.). The historic wellspring of hostility to aid to "pervasively sectarian" schools was, of course, the nativist prejudice – widespread in this country during the latter part of the 19th Century – against the Roman Catholic Church and its parochial schools. *Id.*

[e]very student at [the Academy] receives intensive training in the basic academic skills of English, Mathematics, History, Foreign Language and Science. Art, Music, Drama, Forensics, Theology and Computer Science are essential parts of this program. [The Academy] offers each student a full Physical Education Program designed to develop a sense of sportsmanship, a respect for physical fitness and an awareness of the enjoyment derived from athletic endeavors.

(J.A. at 154.) In its recruiting brochure, the Academy describes itself as "a Christ-centered school operating in the evolving tradition of the Church [that] has always included students and faculty of all faiths." (J.A. at 116.) The course overview of the Academy's Religion Department states that

The academy provides education in, and opportunities for, decision making in the light of Gospel values. These moral and ethical values are taught in an age-appropriate, all-inclusive program developed across disciplines. The religious studies program probes the relationship of self to God, to others, and to the world. The academy teaches a respect for the various religious traditions of the world while presenting itself to the wider community as a Christ-centered institution within the tradition of the Roman Catholic Church.

(J.A. at 322.)

An independent Board of Trustees consisting of no more than 24 members governs the Academy. There are no religious requirements for membership on the Board. Non-Catholics have served, and currently serve, on the Board. The Academy does not discriminate on the basis of race, color, creed, or national origin in its admissions process; nor does it give preference in admission to Roman Catholics. Moreover, the Academy does not discriminate on the basis of race, color, or national origin in any of its educational policies, scholarship and loan programs, athletic or extracurricular

activities, or other-school administered programs. As of the date of the issuance of the bonds at issue, 135 of the 366 (non-preschool) students at the Academy or 37%, were non-Catholic. As of the date of the stipulation, 34% of the students were non-Catholic. Faiths represented in the Academy student body include non-Catholic Christian, Jewish, Islamic, Shinto and others. Furthermore, the Academy does not discriminate on the basis of race, color, creed or national origin in the hiring of its employees. The Academy has a teaching faculty of 60, of whom five are members of religious orders. There is no religious-affiliation requirement or preference for the Academy's teachers, and the school does not inquire as to the religious affiliation of prospective faculty members.

In March 1995, representatives of the Academy approached Defendant with a proposal to obtain tax-exempt bond financing for a project to improve facilities at the Academy (the "Project"). The Project consisted of (1) construction of an approximately 6700 square foot addition to the Academy's lower school, (2) renovation of and improvements to a science wing, and (3) other renovations of existing facilities including new telephone equipment, classroom monitors, fiber-optic cable and an intercom system. The Project did not include any construction, renovation or improvement of the Academy's chapel. On March 13, 1995, the Academy submitted an Application for Assistance to initiate the approval process.

On March 21, 1995, at its regularly scheduled monthly meeting, Defendant unanimously adopted the Resolution of Inducement (the "Resolution") finding that the Project served a public purpose. The Resolution stated that construction of the Project would create job opportunities for the residents of the County and would aid in the general economic welfare of the County and State of Michigan. The Resolution further provided that the Project would create seven new permanent jobs, five teaching and two maintenance positions, at the Academy. Through that Resolution, Defendant decided to

precedent including *Roemer*, *Agostini* and *Hunt*, concluded that providing direct state funding to the general education courses of a *pervasively sectarian* institution would violate the Establishment Clause. *See id.* at 162-63. The court, however, remanded the case because the district court had improperly determined that Columbia Union College was pervasively sectarian as a matter of law. *See id.* at 164. The Fourth Circuit's acknowledgment of the Establishment Clause's prohibition against funding the general education courses of pervasively sectarian schools is neither contradictory to the Supreme Court precedent relied on or the conclusion reached in this case. Nor is it applicable to the case presented here because, as previously discussed, the Academy is not a pervasively sectarian institution.

## CONCLUSION

We therefore conclude that Plaintiff has standing to challenge Defendant's issuance of the tax-exempt revenue bonds for the Academy; however, neither the EDC Act, the revenue-bond program thereunder, nor the issuance of the bonds on behalf of the Academy violate the Establishment clause inasmuch as the program has a secular purpose and its primary effect neither advances or inhibits religion. Accordingly, we **AFFIRM** the district court's order denying summary judgment to Plaintiff and granting summary judgment to Defendant.

*Nyquist* involved an action which challenged the constitutionality of    New York statutes that gave (1) maintenance and repair grants and tuition reimbursement grants to nonpublic schools; and (2) income tax benefits to parents of the children attending New York nonpublic schools. 413 U.S. at 761-70. The Court held that the income tax benefits provisions of the statutory scheme, the maintenance and repair grants and the tuition reimbursement grants violated the Establishment Clause. *See id.* at 798. These provisions are distinguishable from the case at bar because they authorized direct payments or income tax benefits to only nonpublic schools (or to the parents of students attending those schools), virtually all of which were Roman Catholic without any restrictions as to the use of the funds.[7]  *See id.* at 774-80; *see also Mueller*, 463 U.S. at 396 (distinguishing *Nyquist* on ground that aid was not made available to all eligible applicants, but only to students in nonpublic schools). In this case, Defendant issues tax-exempt revenue bonds for any qualified applicant, public-nonpublic and sectarian-secular alike. As the facts clearly indicate, past recipients of the bonds have included businesses, which are secular, as well as hospitals, schools and nursing homes, some of which are secular and some are not.

*Columbia Union College* is likewise distinguishable. In that case, Columbia Union College, a private liberal arts college affiliated with the Seventh Day Adventist Church, challenged the Maryland Higher Education Commission's denial of its application for aid under Maryland's Sellinger grant program which provided annual state-funded grants to qualifying private colleges. *See Columbia Union College*, 159 F.3d at 154. The court, relying on Supreme Court

---

[7]Similarly, this Court's recent decision in *Simmons-Harris v. Zelman*, 234 F.3d 945 (6th Cir. 2000), does not change the result in this case. The voucher program at issue in *Simmons-Harris* was akin to the programs held unconstitutional in *Nyquist*. Therefore, Plaintiff cannot rely upon *Simmons-Harris* for the same reasons that it cannot rely on *Nyquist*.

issue economic development limited obligation revenue bonds for the purpose of paying the costs of the Project, provided that all necessary preliminary hearings, proceedings, approvals, and other requirements of the EDC Act were satisfied. The Resolution stated that under no circumstances would Defendant, Oakland County, the State of Michigan, or any of its taxpayers or citizens ever be required to pay the principal, interest, or any other costs associated with the bonds, e.g., attorneys', trustee's, placement agent's, or remarketing agent's fees, or any letter-of-credit, real estate, title-related or other costs. The Resolution provided that Defendant would retain a private law firm as bond counsel on the Project. The counsel's legal fees were to be paid by the Academy from the proceeds of the sale of the bonds, but not as a cost to Defendant.

On April 28, 1995, the Oakland County Clerk caused to be published in the *Oakland Press* a Notice of Public Hearing on the Project plan for the Academy. The notice announced a hearing on the Project and invited the submission of written comments. Plaintiff neither attended the meeting nor provided the Commissioners with any objections or other written comments on the Project. No other person objected to the Project. After the hearing, the Board of Commissioners gave final approval to the project plan. On June 20, 1995, Defendant unanimously adopted a Bond Authorizing Resolution authorizing the issuance of limited obligation revenue bonds for the Project.

On June 27, 1995, Defendant issued variable rate demand limited obligation revenue bonds, which were delivered to and sold by NBD Bank to private investors. The proceeds from the sale of the bonds were loaned to the Academy pursuant to a Loan Agreement, which requires the Academy to make all payments of principal and interest on the loan directly to the bank. Under the Loan Agreement, the Academy is responsible for paying all fees and expenses incurred by Defendant relating to the Project. In addition, all of the financing documents provide that neither the State of

Michigan nor any political subdivision thereof is obligated to pay the principal or interest on the bonds or any other cost incident thereto. The Project is now complete and the Academy is making quarterly interest and annual principal payments under the terms of the loan note.

The Academy paid fees of $5875 to Defendant in connection with the Project. This sum more than covered the expenses incurred by Defendant in connection with the Project.

Bonds issued under the EDC Act are exempt from all taxation in the State of Michigan except inheritance and transfer taxes, and the interest thereon is exempt from all taxation in the state of Michigan. *See* Mich. Comp. Laws Ann. § 125.1623(1). Moreover, because the bonds in this case meet the relevant criteria of § 103 of the Internal Revenue Code, interest on the bonds is also excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. *See* 26 U.S.C. § 145.

The Academy loan was for the sum of $3.5 million. Under the Loan Agreement, the Academy is obligated to repay the borrowed principal over a 10-year period with a final payment of principal scheduled for December 1, 2005. The Academy also makes quarterly payments to cover the outstanding interest obligation of the loan. Because of the tax-exempt status of the bonds and the interest thereon, the interest payments made by the Academy to the bank were less than such payments would have been for an otherwise comparable non-tax-exempt commercial loan. If the Academy project had not been approved by Defendant, it was the Academy's plan to obtain a commercial loan from a bank to finance the improvements of its school facilities. Plaintiff estimates that the savings to the Academy as a result of the tax-exempt status of the bonds is over $1 million. Plaintiff further alleges that, as a result of the Project and the tax-exempt nature of the

Catholic Christian, Jewish, Islamic, Shinto and others. Finally, the Academy does not discriminate on the basis of race, color, creed or national origin in the hiring of its employees. The Academy has a teaching faculty of 60, of whom five are members of religious orders. There is no religious-affiliation requirement or preference for the Academy's teachers, and the school does not inquire as to the religious affiliation of prospective faculty members.

We thus conclude that the issuance of the tax-exempt revenue bonds does not require excessive government entanglement. In this case, the government involvement with the Academy is a one-time matter; the Academy is not aimed more at sectarian rather than secular education; and the government aid was not used for the religious purposes of the Academy.[6]

In arguing that Defendant's issuance of the tax-exempt revenue bonds has the primary effect of advancing religion, Plaintiff chiefly relies on two cases: *Nyquist*, *supra*, and *Columbia Union Coll. v. Clarke*, 159 F.3d 151 (4th Cir. 1998). Plaintiff's reliance on these cases is misplaced because neither controls the instant case.

---

[6]Furthermore, we echo the district court's concern that the result Plaintiff urges this Court to reach poses a far more serious constitutional problem than the religiously neutral program presently operated by Defendant. As the district court stated,

> [I]t seems clear that government and religion would become much more entangled if EDCs were required to deny funding to any religiously affiliated institution. If this were the case, EDCs would have to examine each application in an effort to identify those with any religious affiliation. This would also enhance the risk of discriminating against sectarian institutions in violation of the Free Exercise Clause. The Supreme Court has repeatedly called for government to be *neutral* in its treatment of religion. This goal is best served by permitting EDCs to evaluate applications without regard to the religious affiliation, if any, of the applicant, and to allow the EDCs to focus instead on the purely secular aspects of the proposed project in each case.

*Johnson*, 64 F. Supp. 2d 657, 667 n.1 (emphasis in original).

pre-school through and including the 12th grade, wherein the arts and sciences, and other forms of primary and secondary learning are taught, and diplomas and honors therein conferred: while maintaining a philosophy consonant with that of the network of the Sacred Heart schools of which it is a member." (J.A. at 66.)  The Academy's curriculum and requirements provides that

> [e]very student at [the Academy] receives intensive training in the basic academic skills of English, Mathematics, History, Foreign Language and Science. Art, Music, Drama, Forensics, Theology and Computer Science are essential parts of this program.  [The Academy] offers each student a full Physical Education Program designed to develop a sense of sportsmanship, a respect for physical fitness and an awareness of the enjoyment derived from athletic endeavors.

(J.A. at 154.)  A review of the course descriptions and the subjects covered for each of the courses offered at the Academy, with the exception of the Religion Department, demonstrates that the Academy does not interject religion into every aspect of its curriculum.  Moreover, there are no religious requirements for membership on the Academy's Board of Trustees. Non-Catholics have served, and currently serve, on the Board.

In addition, the Academy does not discriminate on the basis of race, color, creed, or national origin in its admissions process, nor does it give preference in admission to Roman Catholics. Furthermore, the Academy does not discriminate on the basis of race, color, or national origin in any of its educational policies, scholarship and loan programs, athletic or extracurricular activities, or other-school administered programs. As of the date of the issuance of the bonds at issue, 135 of the 366 (non-preschool) students at the Academy, or 37%, were not Catholic. And as of the date of the stipulation, 34% of the students were not Catholic. The facts indicate that faiths represented in the Academy student body include non-

bonds, the Michigan treasury will lose $68,400 in tax revenue.

The parties have stipulated that, in approving the financing of the Project, Defendant acted without regard to the religious affiliation of the Academy.  Since its creation in 1980, Defendant has approved financing of numerous projects using the same criteria that were used to approve the Academy Project.  Those projects have included various for-profit undertakings including construction of factories and office buildings and  the purchase of machinery and equipment. Those projects have also included various not-for-profit entities including schools, medical facilities and nursing homes--some of which are religiously affiliated and some of which are not.

After Defendant issued the tax-exempt revenue bonds on behalf of the Academy, Plaintiff, on April 21, 1998, filed a complaint in the district court alleging that Defendant's issuance of tax-exempt revenue bonds on behalf of the Academy for construction of certain buildings on the Academy's campus violated the Establishment Clause. After responsive pleadings were filed, on November 13, 1998, Defendant filed a motion for summary judgment.  On that same day the parties filed a joint stipulation of the facts. While Defendant's motion for summary was pending, Plaintiff filed, with the court's approval, a second-amended complaint on November 24, 1998.  Defendant answered the second-amended complaint and filed amended counterclaims on November 30, 1998.  On December 12, 1998, Plaintiff filed a motion for summary judgment.  The district court granted Defendant's motion for summary judgment and denied Plaintiff's motion for summary judgment on June 29, 1999.  *See Johnson v. Economic Dev. Corp.*, 64 F. Supp. 2d 657 (E.D. Mich. 1999).  This appeal followed.

## ANALYSIS

### I.

"Standing is 'the threshold question in every federal case.'" *Coyne v. American Tobacco Co.*, 183 F.3d 488 (6th Cir. 1999) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). We review the district court's determination of standing *de novo*. *See id.* at 492.

Plaintiff claims that he has state taxpayer standing because the issuance of the tax-exempt bonds violated the Establishment Clause and cost the Michigan treasury $68,400 in lost revenue from income tax that would have resulted from the interest on the bonds. Defendant, however, argues that Plaintiff lacks standing to sue because he has failed to allege a nexus between a legislative expenditure and the alleged Establishment Clause violation. The district court held that Plaintiff had "standing due to the potential loss of revenue caused by the issuance of tax-exempt bonds." *Johnson*, 64 F. Supp. 2d at 661 (relying on *Hawley v. City of Cleveland*, 773 F.2d 736, 741-42 (6th Cir. 1985)). This Court agrees.

Very few cases have dealt with state taxpayer standing as it relates to the Establishment Clause. We find, however, that the Supreme Court's decision in *Doremus v. Board of Education*, 342 U.S. 429 (1952), controls the instant case. In *Doremus*, the Court held that the plaintiffs lacked state taxpayer standing to challenge the school district's practice of reading five verses from the Old Testament at the opening of each public school day as a violation of the Establishment Clause. 342 U.S. at 433-35. The plaintiffs did not have standing, the Court concluded, because they failed to allege a "good-faith pocketbook" injury, i.e., that there was a "financial interest that is, or is threatened to be, injured by the unconstitutional conduct." *Id.* at 434-35. Therefore, the question now before this Court is whether Plaintiff has alleged the requisite financial interest.

involved a program where the South Carolina government provided tax-exempt revenue bonds to colleges in the state, some of which were religiously affiliated, for projects to improve or construct college facilities. *Id.* at 737-39. There, as with the present case, the statute by which the program was governed, provided that the interest on the bonds would be tax-exempt, which meant that the interest rate on the loans thereon would be lower. *See id.* at 739. The Court in *Hunt* held that the program was constitutional despite that some of the bonds were issued to religiously affiliated schools. In so doing, the Court considered these factors: (1) there were no religious qualifications for faculty membership or student admission; (2) only sixty percent of student body was Baptist, the faith of the religious institution; (3) nothing in the record indicated that institution was aimed more at sectarian rather than secular education; and, (4) the government program provided aid to the secular rather than the religious purpose of the institution because religious buildings were excluded from the construction. *See id.* at 743-44.

Here, as in *Roemer* and *Hunt*, there is no excessive government entanglement. In this case, once Defendant issues the bonds, it has no further contact with any of the applicants, including the Academy, or the process. The loan is repaid to the bondholders through the bank; Defendant is not involved. In addition, the loan agreement and the EDC Act expressly provide that the state, municipality or Defendant will not be held liable for any interest or principal on the loan. Moreover, no funds from the loan will benefit the sectarian nature of the Academy because the Project expressly excluded the school's chapel as did the project in *Hunt*.

As to the nature of the institution, as with any religiously affiliated school, the Academy pledges its allegiance to its faith. Nevertheless, the facts establish that the Academy is not a pervasively sectarian institution. The Academy's Restated Articles of Incorporation provide that the school's purpose is to "conduct an independent Catholic school from

entities. Similarly, the program is in no way skewed towards religion and does not delineate its beneficiaries by reference to religion.

Finally, the issuance of the tax-exempt bonds does not create excessive government entanglement. In *Agostini*, the Court recognized that "[i]nteraction between church and state is inevitable." 521 U.S. at 233. Thus the "[e]ntanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Id.* To determine whether there is excessive government entanglement, the court looks at (1) the character and purpose of the institution that is benefitted; (2) the nature of the aid that the state provides; and, (3) the resulting relationship between the government and religious authority. *See id.* at 232.

The Court's decisions in *Roemer* and *Hunt* are instructive on this issue. In *Roemer*, the Court found that no excessive government entanglement resulted from a Maryland state program that provided aid to religious and nonreligious institutions alike. 426 U.S. at 755-58. There the Court surveyed the nature of the sectarian institution that benefitted from the program and found that (1) attendance at Roman Catholic Chapel service was not required; (2) although the school required mandatory religious courses, they only supplemented a curriculum covering a spectrum of liberal arts courses; (3) apart from the theology department, faculty hiring decisions were not made on religious basis; and (4) the student body was chosen without regard to religion. *See id.* In addition, the Court noted that the government only issued the aid once a year and there was no particular use of state funds for religious purposes. *See id.* at 762. Given these factors, the Court concluded that there was no excessive government entanglement. *See id.*

In *Hunt*, a case that bears a striking resemblance to the case at bar, the Court used similar criteria to determine that the government program in that case did not result in excessive government entanglement. 413 U.S. at 743-44. *Hunt*

Defendant argues that this requisite financial interest must be an expenditure of government funds. *See* Appellee's Br. at 16 (citing, *inter alia*, *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 793 (9th Cir. 1999); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 408 (5th Cir. 1995); *Friedmann v. Sheldon Community Sch. Dist.*, 995 F.2d 802 (8th Cir. 1993)). Defendant's reliance on these cases, however, is misplaced. Although each of these cases specifically found that the plaintiffs lacked standing because they failed to allege that there was a government expenditure of funds, none of these cases address the precise issue now before this Court-- whether a loss of revenue is sufficient to establish a financial interest under *Doremus*. *See Madison Sch. Dist. No. 321*, 177 F.3d at 793 (holding that plaintiff lacked standing to challenge Establishment Clause violation where challenged act was graduation prayer and there was no financial interest involved); *Duncanville Indep. Sch. District.*, 70 F.3d at 408 (holding that plaintiff lacked standing to challenge Establishment Clause violation where challenged act was distribution of bibles on school's premises which did not involve financial interest); *Friedmann*, 995 F.2d at 803 (holding that plaintiffs lacked standing to challenge Establishment Clause violation where challenged act was reading of invocation or benediction at graduation ceremony).

Contrary to Defendant's argument, the Supreme Court in *Doremus* did not distinguish between an expenditure and loss of revenue in determining whether there was a "good-faith pocketbook injury." Under *Doremus*, state taxpayer standing simply requires that there is a "requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct." 342 U.S. at 435. Moreover, the Supreme Court has decided several cases involving Establishment Clause challenges to tax exemptions as they relate to religious entities. *See e.g., Walz v. Tax Comm'n*, 397 U.S. 664 (1970) (property tax exemption for churches); *Hunt v. McNair*, 413 U.S. 734 (1973) (tax exemption for state issued revenue bonds, some of which went to religiously affiliated schools); *Mueller v. Allen*, 463 U.S. 388 (1983) (state income tax

deduction for school expenses where some of taxpayers' children attended religious schools).  Defendant argues that these cases have no precedential value because the Court did not specifically address whether the plaintiffs had standing in those cases.  *See* Appellee's Br. at 18 n.7 (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 92 (1998)).  Defendant's point is well-taken.  Notwithstanding, in a case where the Supreme Court specifically addressed state taxpayer standing to challenge violations of the Establishment Clause, the Court cited with approval many of the cases it had previously decided on the merits without specifically addressing the standing issue, including *Hunt*, a case involving a program similar to the one at issue here.  *See School Dist. v. Ball*, 473 U.S. 373, 380 n.5 (1985), *overruled on other grounds by Agostini v. Felton*, 521 U.S. 203 (1997).[1]

There is also guidance from this Court's precedent.  In *Hawley*, this Court held that a municipal taxpayer could satisfy the standing requirement by establishing that the challenged activity involves a measurable appropriation or loss of revenue to the municipality.  773 F.2d at 741-42.  Defendant argues that *Hawley* is inapplicable to this case because *Hawley* involved municipal taxpayer standing which requires a different test than state taxpayer standing.  The Court in *Hawley*, however, made no distinction between state taxpayer standing and municipal taxpayer standing.  In *Hawley*, this Court stated "the Supreme Court continues to allow suits by *nonfederal taxpayers* to enjoin unconstitutional acts affecting *public finance*."  *Id.* at 742 (emphasis added).

---

[1]In *Ball*, the Court stated

Petitioners alleged that respondents lacked taxpayer standing under *Flast v. Cohen*, and *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*. The District Court and the Court of Appeals rejected the standing challenge. We affirm this finding, relying on the numerous cases in which we have adjudicated Establishment Clause challenges by state taxpayers to programs for aiding nonpublic schools.

473 U.S. at 380 n.5 (citing, *inter alia*, *Hunt v. McNair*, 413 U.S. 734, 735 (1973)) (other citations omitted).

of the tax-exempt bonds, the bondholder will be able to exclude the interest on those bonds from its taxable income; and that benefit will likely be passed to the loan recipient in the form of lower interest rates, as was done in this case.  However, as noted earlier, the interest rate of the loan is determined by the bank according to the prevailing financial market; therefore, any benefit received from the lower interest rate is determined not by the government, but by the bank and the prevailing financial market.  Moreover, as was the case in *Zobrest*, no funds traceable to government expenditures ever reach the coffers of the sectarian school, in this case the Academy.  The facts show that Defendant was more than reimbursed for any and all fees it incurred as a result of the application process.

Plaintiff argues that Defendant's issuance of the revenue bonds does allow government funds to reach the coffers of the Academy. This is so, Plaintiff argues, because the issuance of the revenue bonds relieves the Academy of costs it otherwise would have borne and the Academy is thereby free to devote those resources toward its sectarian activities.  Plaintiff's argument is flawed and has repeatedly been rejected by the Supreme Court.  *See Roemer*, 426 U.S. at 747 ("The Court has not been blind to the fact that in aiding a religious institution to perform a secular task, the State frees the institution's resources to be put to sectarian ends. *If this were impermissible, however, a church could not be protected by the police and fire departments . . . .  The Court never has held that religious activities must be discriminated against in this way.*") (emphasis added); *Hunt*, 413 U.S. at 742 ("[T]he Court has not accepted the *recurrent* argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.") (emphasis added).

The issuance of the tax-exempt bonds, generally, and specifically for the Academy, in no way creates a financial incentive for the bondholders who actually receive the exemption to favor religious entities over nonreligious

Furthermore, even the decisions on which Defendant relies reflect the principle that both state and municipal taxpayers must satisfy the "good faith pocketbook injury" requirement to establish standing. *See Madison Sch. Dist. No. 321*, 177 F.3d at 793 (recognizing that the *Doremus* requirement of a pocketbook injury applies to both municipal taxpayer and state taxpayer standing) (citing *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991)); *Duncanville Indep. Sch. Dist.*, 70 F.3d at 408. Similarly, other courts that have addressed state taxpayer standing reflect the *Hawley* Court's view that "to establish state taxpayer standing, plaintiffs must show the challenged activity involves 'a measurable appropriation' or loss of revenue, and 'a direct dollars-and-cents injury.'" *Schneider v. Colegio de Abogados*, 917 F.2d 620, 639 (1st Cir. 1990) (quoting *Doremus*, 342 U.S. at 434); *accord Madison Sch. Dist. No. 321*, 177 F.3d at 796 (citing *Schneider*, 917 F.2d at 639).

We conclude that Plaintiff has satisfied the *Doremus* test for state taxpayer standing. Plaintiff has alleged that he is a Michigan state taxpayer and a resident of Oakland county. He has further alleged that the Michigan treasury would lose approximately $68,400 in revenue because of the tax-exemption accorded the interest on the revenue bonds issued on behalf of the Academy by Defendant. Moreover, Plaintiff has alleged that the issuance of these tax-exempt bonds to the Academy violated the Establishment Clause. Under *Doremus*, Plaintiff has sufficiently established a financial interest that is threatened by this alleged Establishment Clause violation, thereby conferring state taxpayer standing.

## II.

We now turn to the district court's order granting summary judgment to Defendant on Plaintiff's Establishment Clause claim.

We review a district court's order granting summary judgment *de novo*. *See Johnson v. Univ. of Cincinnati*, 215

F.3d 561, 572 (6th Cir. 2000). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Moreover, constitutional questions are questions of law subject to *de novo* review. *See United States v. Jackson*, 181 F.3d 740, 743 (6th Cir. 1999); *United States v. Knipp*, 963 F.2d 839, 843 (6th Cir. 1992).

Defendant, a privately funded government corporation, issued tax-exempt revenue bonds for the Project on behalf of the Academy, a Roman Catholic elementary and secondary school. The Project included (1) construction of an approximately 6700 square foot addition to the Academy's lower school, (2) renovation of and improvements to a science wing, and (3) other renovation of existing facilities including new telephone equipment, classroom monitors, fiber-optic cable and the intercom system. The bonds were delivered to and sold by NBD Bank to Cede & Co, the bondholder. The proceeds from the sale of the bonds were loaned to the Academy for completion of the Project. Because the revenue bonds are tax-exempt, the interest paid on the loan is also exempt from Michigan income tax. This benefit of the tax-exempt nature of the bonds is generally passed on to the borrower, the Academy in this case, by way of lower interest rates on the loans. The terms of the bonds, however, provides that the interest rate on them "shall be determined weekly by NBD Bank" according to the "prevailing financial market conditions," not by Defendant. Moreover, NBD Bank may raise the interest under the agreement, as it purportedly did as a result of this lawsuit.

Plaintiff alleges that because the Academy is a Roman Catholic school, Defendant violated the Establishment Clause when it issued the tax-exempt bonds on behalf of the Academy. Plaintiff claims that this alleged constitutional violation resulted in a benefit to the Academy, i.e, the lower interest rate, and a loss of tax revenue to the state treasury. Essentially, Plaintiff contends that issuance of the revenue bonds for the Academy, which were awarded without regard

others that are not. Moreover, the loan proceeds from the tax-exempt bonds did not go to the religious aspects of the Academy. The funds were limited to construction of an addition to the lower middle school, renovation of the science wing, and other renovations of existing secular facilities. The funds were not used for the construction, renovation, or improvement of the Academy's Chapel. Given the broad range of groups that may be eligible for tax-exempt bond financing on the basis of neutral criteria and the fact that the funds were used for the secular purposes for which they were intended, under the guidance of *Mueller*, *Witters*, and other Supreme Court precedent, it cannot be said that any religious indoctrination that occurs at the Academy can be attributed to the government.

In *Mitchell*, the Court stated that the second criterion, whether the government program defines its recipients by reference to religion, is closely related to the first criterion, i.e., governmental indoctrination. 120 S. Ct. at 2543. The second criterion is related to the first in that the court looks to the same set of facts as under the focus on neutrality in the first criterion. *See id.*; *Agostini*, 521 U.S. at 225-26. However, when looking at these facts in the second criterion, the court must answer the question whether the "criteria for allocating the aid 'creat[e] a financial incentive to undertake religious indoctrination.'" *Mitchell*, 120 S. Ct. at 2543 (quoting *Agostini*, 521 U.S. at 231) (alteration in original). "This incentive is not present, however, where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Agostini*, 521 U.S. at 231. We conclude that the issuance of the tax-exempt revenue bonds satisfies this prong of the test as well.

This principle has been consistent throughout more recent Supreme Court precedent. It was relied on by the Court in *Zobrest* and *Witters* in upholding two government programs that provided some benefit to religious institutions. In *Witters*, the Court stated that

The Court in *Mueller* and *Witters v. Washington Department of Services for the Blind*, 474 U.S. 481 (1986), used similar reasoning in determining that there was no government indoctrination. In *Mueller*, the Court held that a Minnesota statute, which benefitted religious and non-religious schools alike, allowing taxpayers to deduct school expenses in computing state income tax, did not violate the Establishment Clause. 463 U.S. at 388. In so holding, the Court concluded that "the state's provision of a forum neutrally 'open to a broad class of nonreligious as well as religious speakers' does not 'confer any imprimatur of State approval,' so here: 'the provision of benefits to so broad a spectrum of groups is an important index of secular effect.'" *Id.* at 397 (citation omitted). The Court went on to conclude that "[a] program [like the Minnesota tax deduction] that neutrally provides state assistance to a broad range of citizens is not readily subject to challenge under the Establishment Clause." *Id.* at 398-99.

In *Witters*, the Court held that the Establishment Clause did not preclude the state from extending assistance under a state vocational rehabilitation assistance program to a blind person who chose to study at a Christian college to become a pastor, missionary, or youth director. 474 U.S. at 481. There the Court concluded that the program, which was made available on the basis of neutral criteria without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution, did not have the primary effect of advancing or inhibiting religion. *See id.* at 488.

The facts in this case reveal that Defendant, attempting to further the secular purpose of the EDC Act, issued tax-exempt revenue bonds on behalf of applicants, including the Academy, without regard to religion. The facts further demonstrate that since its creation in 1980, Defendant has approved financing of numerous projects using the same criteria that were used to approve the Academy Project. These projects have included various for-profit as well as not-for-profit entities--some of which are religiously affiliated and

to religion, violates the Constitution simply because the Academy is a Roman Catholic school. We do not believe that Establishment Clause jurisprudence supports such a conclusion.

## A.

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Supreme Court has consistently held that the Establishment Clause, prohibiting government establishment of religion, and the Free Exercise Clause, prohibiting government restrictions of the free exercise of religion, must function in harmony. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947); *Walz*, 397 U.S. at 669-70. To that end, although states cannot support or establish religion, neither can they deny any individual or entity the benefits of public welfare legislation because of their religion or lack thereof. *See Everson*, 330 U.S. at 16. "[The First] Amendment requires the state to be a neutral in its relations with groups of religious believers and nonbelievers; it does not require the state to be their adversary." *Id.* at 18; *accord Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993) ("We have never said that 'religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs.'") (quoting *Bowen v. Kendrick*, 487 U.S. 589, 609 (1988)); *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 746 (1976) ("[R]eligious institutions need not be quarantined from public benefits that are neutrally available to all."). With this basic foundation in mind, we first address several arguments made by Plaintiff which are contrary to the very principle we have just discussed.

First, Plaintiff contends that the Establishment Clause prohibits a state from "providing any *financial aid* to sectarian elementary and secondary schools." *See* Appellant's Br. at 11 (emphasis in original). This statement is simply incorrect.

*See Mueller*, 463 U.S. at 393; *Hunt*, 413 U.S. at 743-44; *see also Comm. for Pub. Educ. & Religious Liberty v. Regan*. Sectarian refers to an organization that "operate[s] in a secular manner but ha[s] a religious affiliation." *Bd. of Educ. v. Grumet*, 512 U.S. 687, 705 n.8 (1994). The Supreme Court has consistently rejected the argument that any and all government aid to a religiously affiliated institution violates the Establishment Clause. *See Agostini*, 521 U.S. at 225 ("[W]e have departed from the rule relied on in *Ball* that all government aid that directly assists the educational function of religious schools is invalid."); *Mueller*, 463 U.S. at 393 ("One fixed principle in this field is our consistent rejection of the argument that 'any program which in some manner aids an institution with a religious affiliation' violates the Establishment Clause.") (citation omitted); *Roemer*, 426 U.S. at 747 ("*Everson* and *Allen* put to rest any argument that the State may never act in such a way that has the incidental effect of facilitating religious activity."); *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 770 (1973) ("It is . . . well established . . . that not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid."). What the Establishment Clause prohibits is not aid to all sectarian schools, but aid to an "institution in which religion is so *pervasive* that a *substantial portion of its functions* are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." *Hunt*, 413 U.S. at 743 (emphasis added). Plaintiff, citing *Hunt*, confuses the distinction between a sectarian institution and a pervasively sectarian institution and then concludes that the Academy is pervasively sectarian because it is a religiously affiliated school. *See* Appellant's Br. at 19 n.12. This argument not only misreads *Hunt*, but is utterly unsupported by Supreme Court precedent. A pervasively sectarian institution is one whose religious functions cannot be separated from its non-religious functions; an institution is not pervasively sectarian

advancing or inhibiting religion. Under the revised test set out in *Agostini*, a government program does not have the primary effect of advancing or inhibiting religion if it: (1) does not result in government indoctrination of religion; (2) does not define its recipients by reference to religion; or (3) create an excessive government entanglement with religion. *See Mitchell*, 120 S. Ct. at 2541 (citing *Agostini*, 521 U.S. at 234).

"[T]he question whether governmental aid to religious schools results in governmental indoctrination is ultimately a question whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action." *Mitchell*, 120 S. Ct. at 2541. The Supreme Court has held that in distinguishing between indoctrination that is attributable to the State and indoctrination that is not, the court must turn to

the principle of neutrality, upholding aid that is offered to a broad range of groups or person without regard to their religion. If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government . . . . To put the point differently, if the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose.

*Id.*; *accord Zobrest*, 509 U.S. at 8 ("[W]e have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without references to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit."). The issuance of the tax-exempt revenue bonds under the EDC Act meets this criterion and, thus, does not result in government indoctrination.

The purpose of the Act as stated in the Act itself is to "alleviate and prevent conditions of unemployment." Mich. Comp. Laws. Ann. § 125.1602. To deal with the problems of unemployment, the legislature found it "necessary to assist and retain local industrial and commercial enterprises" and "to provide means and methods for the encouragement and assistance of industrial and commercial enterprises . . . in locating, purchasing, constructing, reconstructing, modernizing, improving, maintaining, repairing, furnishing, equipping, and expanding in this state and in its municipalities." *Id.* To that end, the legislature authorized the creation of local EDC's such as Defendant to administer the Act's programs, which included the issuance of revenue bonds. *See id.* §§ 125.1603(d), 125.1607(d).

A state's decision to assist businesses in their operation in order to create and maintain jobs--regardless of the type of business--"evidences a purpose that is both secular and understandable." *Mueller*, 463 U.S. at 395. Michigan could conclude that there is a strong public interest in promoting, assisting, and retaining commercial and industrial enterprises, both sectarian and non-sectarian. *See id.* ("Minnesota, like other states, could conclude that there is a strong public interest in assuring the continued financial health of private schools, both sectarian and non-sectarian."). We conclude that the EDC Act and the programs that result from it have a secular purpose, satisfying the first prong of the *Lemon* test.[5]

The second prong of the *Lemon* test requires that the government program not have the primary effect of either

_____

[5] In addition, the Supreme Court has consistently recognized that traditionally "'[l]egislatures have especially broad latitude in creating classifications and distinctions in tax schemes.'" *Mueller*, 463 U.S. at 396 (quoting *Regan v. Taxation with Representation*, 461 U.S. 540 (1983) (alteration in original)). This is so because "the 'familiarity with local conditions' enjoyed by legislators especially enable them to 'achieve equitable distribution of the tax burden.'" *Id.* (quoting *Madden v. Kentucky*, 309 U.S. 83, 87 (1940)).

merely because it is religiously affiliated.[2] *See Hunt*, 413 U.S. at 743.

Second, Plaintiff claims that "[t]here has never been a case where the Supreme Court has held that the Establishment Clause permits the state to provide [direct] financial aid to a religious institution – as a part of a "neutral" program or otherwise." Appellant's Br. at 21. This statement is simply

_____

[2] Although I agree with Judge Nelson that we need not decide in the case at bar whether the issuance of tax exempt revenue bonds would be invalid if the aid were for the benefit of a pervasively sectarian institution, I am not at all sure that I agree with his statement that "we would [not] necessarily hold the financing unconstitutional if the Academy's sectarian character were 'pervasive.'" Concurring opinion, *post*. The principle expressed in *Hunt v. McNair*, 413 U.S. 734 (1973), that government aid in the form of tax exempt revenue bonds of the type involved in this case violates the Establishment Clause--when provided to pervasively sectarian institutions--has not been disavowed, at least to my knowledge, by any subsequent majority opinion of the Supreme Court. *Accord Agostini v. Felton*, 521 U.S. 203, 233 (1997) (recognizing that under the Establishment Clause, the court must consider "'the character and purposes of the institutions that are benefitted' . . . (e.g., whether the religious institutions were 'predominantly religious')") (citing *Hunt*, 413 U.S. at 734-44). (Judge Nelson's concurrence heavily relies on Justice Thomas' plurality opinion in *Mitchell v. Helms*, 120 S. Ct. 2530 (2000); however, it is Justice O'Connor's opinion, which does not abolish the distinction between "pervasively sectarian" and "sectarian" institutions and which expressly declines to adopt Justice Thomas' expansive view, that is controlling upon this Court. *See Simmons-Harris v. Zelman*, 234 F.3d 945, 957 (6th Cir. 2000) (recognizing that when Supreme Court decides case where no single rationale explaining result enjoys assent of five Justices, holding of Court is that of those Members who concurred in judgment on narrowest grounds) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).) The Court in *Hunt*, in determining whether the government program at issue had the primary effect of advancing religion, took great pains to demonstrate that the benefitted institution was not a pervasively sectarian institution--taking into account the nature and structure of the institution's student body, governing body, and faculty. *Id.* at 743. The Court further noted that the government program was constitutional because it provided that the aid to the institution "shall not include" projects involving "any buildings or facilities used for religious purposes." *Id.* at 743-44.

incorrect.[3]  It is incorrect because the Supreme Court has indeed upheld statutes which gave direct benefits to sectarian institutions.  In *Regan*, the Court specifically upheld a New York statute that authorized the use of public funds to reimburse church-sponsored and secular nonpublic schools for performing various testing and reporting services mandated by state law.  444 U.S. at 646.  In that case, the Supreme Court rejected the type of categorical statement that Plaintiff urges this Court to adopt.  *See id.* at 662 ("What is certain is that our decisions have tended to avoid categorical imperatives and absolutist approaches at either end of the range of possible outcomes."); *see also Agostini*, 521 U.S. at 225 (overruling *Aguilar v. Felton*, 473 U.S. 402 (1985), and *Ball*, both of which stood for proposition that all direct government aid to sectarian institutions was invalid under Establishment Clause).  More recently, in *Mitchell v. Helms*, 120 S. Ct. 2530, 2544 (2000), the Court again rejected Plaintiff's argument.[4]

Finally, Plaintiff claims that the tax-exemption under the EDC Act is the equivalent of a cash subsidy for purposes of the Establishment Clause.  *See* Appellant's Br. at 13.  Again, Plaintiff's assertion is absolutely without merit.  The Supreme

---

[3] It may also be that Plaintiff's contention is inapposite inasmuch as it is far from settled that the type of aid at issue in this case is direct aid within the meaning of Establishment Clause jurisprudence. *Cf. Walz*, 397 U.S. at 674-75 ("Granting tax exemption to churches . . . operates to afford an indirect economic benefit . . . .") with *Nyquist*, 413 U.S. 756 (holding that tuition reimbursement grants, maintenance and repair grants and income tax benefits to parents of children attending predominantly, private Roman Catholic schools violated Establishment Clause).  The Court in *Hunt* did not find it necessary to resolve this question.  Because we conclude that this case falls squarely within the parameters of *Hunt*, we too decline to resolve this issue at this juncture.

[4] Apparently, Plaintiff confuses the Establishment Clause's prohibition against funding sectarian activities with funding sectarian institutions when the funds are for secular activities, which under many circumstances may not offend the Establishment Clause.

Court has expressly rejected this argument.  "[T]here is a constitutionally significant difference between subsidies and tax exemptions."  *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 590 & n.25 (1997) (citing *Walz*, 397 U.S. at 690).  The difference between subsidies and tax exemptions is that in giving tax exemptions "the government does not transfer part of its revenue . . . but simply abstains from demanding that the [entity] support the state."  *Walz*, 397 U.S. at 675.  Therefore, the benefit provided by the tax-exempt status of the bonds does not amount to a cash subsidy.

### B.

Contrary to Plaintiff's arguments, the Establishment Clause simply requires neutrality.  *See Roemer*, 426 U.S. at 747 ("Neutrality is what is required.  The State must confine itself to secular objectives, and neither advance nor impede religious activity.").  This requirement of neutrality is expressed in the *Lemon* Test, which requires that (1) the challenged government practice have a secular legislative purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive government entanglement with religion.  403 U.S. at 612-13.  The *Lemon* test was refined by the Supreme Court in *Agostini*.  The first prong of the *Lemon* test remained the same; however, the Court reformulated the excessive entanglement prong of the test to include it in the inquiry into the second prong--the primary effect test.  *See Agostini*, 521 U.S. at 232-33.

The EDC Act and programs implemented pursuant to the Act clearly have a secular purpose.  "[G]overnmental assistance programs have consistently survived this inquiry even when they have run afoul of other aspects of the *Lemon* framework."  *Mueller*, 463 U.S. at 394.  "This reflects, at least in part, [a] reluctance to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute."  *Id.* at 394-95.